IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| REZA SADEGHIAN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 18-00009-JB-B |
| UNIVERSITY OF SOUTH ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on Defendants', the University of South Alabama ("South"), Franklin Trimm, M.D. ("Trimm"), and Sophia Goslings, M.D. ("Goslings") Motion for Summary Judgment (Doc. 57), Plaintiff Reza Sadeghian's, M.D. ("Sadeghian") Response to Defendants' Motion for Summary Judgment (Doc. 66), and Defendants' Reply. (Doc. 68). The Motion is ripe for review. After careful consideration, the Court **GRANTS** Defendants' Motion.

### I.    FACTS

Plaintiff began his medical residency at the University of South Alabama in 2014, after he received his Physician Executive MBA from Auburn University in 2012 and completed his Post-Doctoral Fellowship in Biomedical Informatics at the University of Pittsburgh in 2014. (Doc. 56-1 at 8 – 9). As a medical resident, Plaintiff concentrated in pediatric medicine and was responsible for participating in clinical "rounds" or "rotations" in the pediatrics units at South's hospital and other treatment settings. (Doc. 56-2 at 85). While on these rotations, Plaintiff was supervised by South's faculty, often called "attending physicians" on a rotating basis. (*Id.*). During hospital rotations, Plaintiff met patients and their families, analyzed patients' symptoms, developed

1

treatment plans, coordinated treatment plans with others in the hospital, and provided reasoned analysis to attending physicians on why a chosen plan of care was formulated. Other rotations involved more regular contact and supervision by members of the faculty.

Plaintiff, like all residents, had to take In Training Examinations ("ITE's") and participate in semi-annual reviews with South's Program Director, Trimm. (Doc. 56-2 at 89, 96). ITE exams are standardized tests created and graded by the American Board of Pediatrics, and are administered annually across the country. (Doc. 56-2 at 5 – 6). ITE scores help monitor a resident's progress toward completing residency and gauge a resident's likelihood of passing their board examination on the first attempt. (*Id.*). South's faculty do not participate in the creation, administration, or grading of ITE's. Though these tests are not determinative for whether a resident is fit to graduate, they are a tool to help measure a student's progress in a particular area so the faculty can develop a plan to address any deficiencies. (Doc. 56-2 at 6).

Besides ITE exams, Plaintiff received written evaluations from attending physicians who supervised his work. (Doc. 56-2 at 86). These written evaluations contained "milestones" that marked residents' progress in the program. The faculty policy at South was that an attending physician need only provide a written evaluation if he or she supervised a resident for five consecutive days. (Docs. 56-2 at 66 – 68; 56-4 at 30; 56-9 at 4). However, attending physicians sometimes prepared written evaluations after supervising a resident fewer than five days when he or she felt a resident underperformed. (Doc. 56-4 at 30; Doc. 56-9 at 5). Thus, if an attending physician did not work with a resident for at least five consecutive days and observed no underperformance, the attending physician would likely not prepare an evaluation. (Doc. 56-9 at 5).

During the period relevant to the pending action, Goslings was the Associate Program Director and an attending physician occasionally responsible for supervising Plaintiff on rotations in the hospital. (Doc. 56-2 at 66). Plaintiff contends Goslings engaged in inappropriate conduct beginning in August 2014 and that it continued throughout his residency. (Doc. 56-1 at 52 – 53). Specifically, Plaintiff contends Goslings harassed him by sitting too close to him at a table in the resident lounge at the hospital (Doc. 56-1 at 54), touching his hands while taking notes and discussing patients (*id.* at 55), inviting Plaintiff to spend time with her after hours, complimenting his hands' softness (*id.* at 59, 63 – 64), and massaging or resting her hand on his shoulder (*id.* at 59). Plaintiff also contends that during hospital rotations, Goslings would look at him in a manner that suggested she was not paying attention to what he was saying. (Doc. 64-1 at 50 – 51). Plaintiff claims that when Goslings would place her hands on him or sit too close, he would "scoot away" from her to indicate he was not interested or that he needed space. (Doc. 56-1 at 55). Plaintiff cannot recount the number of times Goslings conducted herself in this manner, though he characterizes it as "constant." (Doc. 56-1 at 174 – 175; Doc. 56-8 at 6).

Plaintiff contends that sometime in the second half of 2014, Goslings learned he was in a relationship and she asked Plaintiff several personal questions about it. (Doc. 56-1 at 77). Plaintiff claims these questions made him uncomfortable and that Goslings appeared disappointed to learn about his relationship. (Doc. 56-1 at 78). Around this time, Plaintiff describes Goslings' behavior towards him as having "totally changed." (Doc. 66 at 5). According to Plaintiff, Goslings became more condescending towards him, but her initiation of physical contact did not cease. (Doc. 64-1 at 31 – 32). According to Plaintiff, Goslings never actually propositioned Plaintiff for any sort of physical relationship, nor explicitly conditioned his

evaluations or anything else upon his acquiescence to what Plaintiff perceived as her advances. (Doc. 56-1 at 86 – 87).

Plaintiff contends the consequences of his refusal to submit to Goslings' advances became evident during his second semi-annual review with Trimm.  (Doc. 56-1 at 150 – 151).  During that meeting, and thereafter, Plaintiff and Trimm often disagreed on the nature of Plaintiff's evaluations and how Plaintiff "was treated on the floor."  (Doc. 56-1 at 151).  Plaintiff contends he realized Goslings was responsible for this downward turn because:

> it's all along with the timeline that Dr. Goslings has started to act unprofessional and condescending toward me.  So, if Dr. Trimm's behavior changes, someone who never worked with me, then it's very evident to me that – I don't have anything here that says the organization is fed up with me.  Everybody at South really liked me. So the fact that he's getting that information and giving it to me without proof, with the very small sample size and the response is just a threat, to me it's very clear that it's coming from only one person who acts that way, and that is Goslings.

 (Doc. 56-1 at 154).

Plaintiff scored in the "red zone" on all of his ITEs during his residency, indicating that he was less likely than other residents across the nation to pass his final boards.  (Doc. 56-1 at 454 – 462; Doc. 56-2 at 8 – 10, 18, 19).  After receiving his second year red zone ITE scores, Trimm placed Plaintiff on a formal remediation plan.  (Doc. 56-1 at 140).  As part of his remediation plan, Plaintiff had to draft study notes to address questions he answered incorrectly on his ITE exams. (Doc. 56-1 at 141).  Plaintiff disagreed with this study method, and informed Trimm on more than one occasion that this method was not the way he learned.  (Doc. 56-1 at 145).  This remediation plan became a point of contention between Plaintiff and Trimm, which was noted by others in the program.  (Doc. 56-2 at 38 – 39; Doc. 56-10 at 7).  Plaintiff consistently turned in his

remediation assignments late.  Further, Plaintiff's work was regularly unsatisfactory, requiring additional work.

During his first third-year semi-annual meeting in January 2017, Trimm informed Plaintiff he was placing Plaintiff on probation.  (Doc. 56-1 at 144).  Plaintiff's semi-annual review portfolio from that meeting shows Trimm intended to place Plaintiff on probation in the weeks immediately following January 9, 2017.[1]  In the intervening time, Trimm spoke with other faculty to discuss the terms of Plaintiff's probation.  (Doc. 56-2 at 57 – 58, 101 – 103).  Plaintiff received a written Notification of Probation on February 8, 2017.  (Doc. 56-1 at 506).  Plaintiff completed his probationary requirements before graduation.

Plaintiff contends he attempted to tell Trimm about Goslings' behavior on at least one occasion.  (Doc. 56-1 at 152 – 153).  However, the record discloses Plaintiff first reported Goslings' alleged inappropriate behavior to South on March 14, 2017.  There, Plaintiff submitted an anonymous complaint about Goslings to Samuel McQuiston, M.D., who served as South's Designated Institutional Officer (DIO).  (Doc. 56-1 at 513).  Plaintiff's complaint outlined Goslings' alleged sexual harassment, stating Goslings "made [him] feel uncomfortable with her interest in our personal lives . . . and her constant touching."  (*Id.*).  After an investigation, which included reviews of the pediatrics residents' performance ratings, Dr. Goslings' reviews of residents, anonymous reviews of Goslings submitted by residents, and a discussion with the previous DIO, Dr. McQuiston determined there "[were] not enough specifics in the anonymous complaint and

---

[1] Plaintiff contends Trimm did not inform him he would be placed on probation during this meeting.  Rather, Plaintiff suggests that Trimm merely told Plaintiff he "could place [him] on probation" and "smirked" at him.  (Doc. 56-1 at 146 – 147).  However, Plaintiff's semi-annual review portfolio shows Trimm intended to place Plaintiff on probation following their meeting on January 9, 2017.  (Doc. 56-1 at 498 – 499).

nothing in the data or comments that would suggest a further review or additional discussion or interviews were necessary at that time." (Doc. 56-8 at 3).

On July 21, 2017, Plaintiff sent a notice-of-suit letter to South. (Doc. 56-1 at 519). South conducted an internal investigation in which Plaintiff chose not to participate. (Doc. 56-1 at 522 – 526). After an internal investigation, South's Compliance Officer found that "[t]he alleged conduct did not occur or does not constitute a Sexual Misconduct Policy violation." (Doc. 56-1 at 537). In June 2017, Plaintiff submitted an anonymous evaluation of Goslings via South's "New Innovations" portal website. Plaintiff's review was critical of Goslings' professional abilities but made no allegation of sexual harassment which would have alerted South to any inappropriate behavior. (Doc. 56-1 at 177 – 178, 515, 518).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As succinctly stated by the Eleventh Circuit:

> A factual dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. The moving party bears the burden of proving that no genuine issue of material fact exists. In evaluating the argument of the moving party, the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial.

*Information Systems and Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002)(internal citations and quotations omitted).  The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

*Id*. at 599 (internal citations and quotations omitted).  The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The non-movant's failure to make a sufficient showing on an essential element of its action entitles the moving party to judgment as a matter of law.  *Id.*

## III.    ANALYSIS

Plaintiff alleges Goslings and Trimm engaged in a scheme to penalize him for rejecting Goslings' inappropriate sexual advances in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.  Plaintiff contends that throughout his residency, Goslings made unwanted sexual advances towards Plaintiff and, when rebuffed, Goslings used her supervisory authority to tank Plaintiff's evaluations, which Trimm, in turn, used to place Plaintiff on academic probation.

Plaintiff also alleges Defendant South violated Title IX[2] by failing to remedy gender discriminatory and/or sexually harassing behavior that Plaintiff was subjected to as a resident. Specifically, Plaintiff alleges South permitted a hostile work environment or, alternatively, *quid pro quo* sexual behavior to occur in the pediatric residency program by refusing to intervene in the above-described activities.

### A.  Sex discrimination claim against Goslings.

Plaintiff alleges Goslings sexually discriminated against him for rejecting her inappropriate sexual advances in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.  Plaintiff contends after he rebuffed Goslings' advances, she used her supervisory authority to damage Plaintiff's evaluations, contributing to Plaintiff being placed on academic probation.  "A sexual harassment claim may be based either on an allegation of a *quid pro quo* offer or evidence that a plaintiff was compelled to endure a pervasively hostile working or educational environment." *Keskindis v. University of Massachusetts Boston*, 76 F. Supp. 3d 254, 257 (D. Mass. 2014).  Here, Plaintiff alleges both types of sexual harassment claims.

In her Motion for Summary Judgment,[3] Goslings argues she is entitled to judgment as a matter of law because the undisputed facts demonstrate she did not discriminate against Plaintiff based on sex or engage in sexually harassing behavior.  Specifically, Goslings argues Plaintiff has failed to demonstrate a genuine factual dispute that she ever explicitly or impliedly propositioned

---

[2] This claim is brought pursuant to 20 U.S.C. § 1681(a).

[3] The Defendants submitted an omnibus Motion for Summary Judgment that covers all claims that survived Judge Bivins' Report and Recommendation on Defendants' Motion to Dismiss, which this Court adopted.  (Doc. 30).  To the extent that an argument pertains to only one Defendant, the Court shall refer to that portion of the Motion for Summary Judgment as his, her, or its own.

Plaintiff for sex or that Plaintiff's evaluations were affected by these "advances." Additionally, Goslings argues Plaintiff cannot demonstrate a hostile work environment, as nothing Goslings did qualified as sufficiently severe or pervasive as a matter of law.

In response, Plaintiff argues there is sufficient evidence in the record to deny summary judgment because: (1) Goslings' November 2016 performance evaluation was artificially low; (2) Trimm's remarks to Plaintiff that others in the program were fed up with him allowed Plaintiff to deduce Goslings shared her discriminatory intentions with others; (3) others' positive reviews[4] and commentary about the weight afforded to Goslings' evaluation indicate Goslings participated in a scheme to harm Plaintiff; and (4) a female resident who also had "Red Zone" ITE scores was not placed on probation.  (Doc. 66 at 19 – 20).  Plaintiff argues the evidence shows Goslings discriminated against him based on his gender and such discrimination is evident through her sexual harassment.

### 1. Plaintiff's *quid pro quo* sexual harassment claim against Goslings

"The gravamen of a *quid pro quo* sexual harassment claim is that the employer conditions an employment benefit or job status upon the employee's submission to conduct of a sexual nature." *Splunge v. Shoney's, Inc.*, 874 F. Supp. 1258, 1269–70 (M.D. Ala. 1994) (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989) (citing *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2405).  To state a *prima facie* case for *quid pro quo* sexual harassment against an employer, a plaintiff must demonstrate:

---

[4] Plaintiff asserts ". . . his evaluations were positive except for those submitted by Dr. Goslings."  (Doc. 66 at 19). However, Plaintiff cites only one evaluation with specificity for this proposition.  (*Id.* at 20) (citing Dr. Renee Roca's evaluation in Doc. 64-9 at 2 – 13).  Though Plaintiff may suggest he also relies on Dr. Curtis Wade Turner's review from November 2016, his brief explicitly indicates Turner's review was cited for other purposes.  (Doc. 66 at 20).

> (1) that the employee belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation or terms, conditions or privileges of employment.

*Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir. 1987) (citing *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982)).  "Additionally, it is essential that the plaintiff show a nexus between the harassing conduct and a job-related reprisal."  *Early v. Morris Newspaper Corp.,* 54 F. Supp. 2d 1261, 1267 (M.D. Ala. 1999).  This means "there should be a reasonable 'verbal/temporal' relationship between the offensive request or conduct and a discussion of the employee's job benefit or detriment."  *Early,* 54 F. Supp. 2d at 1267 (citing *Fowler v. Sunrise Carpet Indust., Inc.*, 911 F. Supp. 1560, 1578 (N.D. Ga. 1996)).  Further, "[w]hether implicit or explicit, there must be in fact some evidence of a threatened or promised impact on employment."  *Id.*

It is undisputed that Goslings' actions never rose to the level of explicit conditionality. (Doc. 56-1 at 86 – 87).  Goslings never expressly stated Plaintiff would suffer some detriment if he did not accept her advances.  Plaintiff's claim rests on inference, making this an implicit *quid pro quo* sexual harassment claim.  *See Early,* 54 F. Supp. 2d at 1268.  Plaintiff notes the following timeline of events: (1) Goslings discovering Plaintiff was in a relationship in the latter half of 2014, (2) Trimm informing him people in the program were "sick of him" during a semi-annual meeting, (3) Goslings' November 2016 evaluation, (4) Plaintiff's poor semi-annual meeting with Trimm and being told he "could" be placed on probation in January, 2017, and (5) the subsequent imposition of probation in February, 2017.  Plaintiff infers that these events resulted from Goslings' influence and Trimm's acquiescence.

The Court need not give Plaintiff the benefit of his arguments, just the benefit of facts and justifiable inferences drawn from them. *See Hariston v. Gainseville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir. 1993). Here, the inference Plaintiff advocates – that he was placed on probation because he refused Goslings' advances – is too tenuous. Plaintiff's inference is neither justifiable nor supported by the record. Indeed, the undisputed facts in this case belie Plaintiff's implicit claim.

The record, viewed in the light most favorable to Plaintiff, simply does not present a material factual dispute concerning Plaintiff's contention that Goslings sowed discontent for him with Trimm because Plaintiff spurned her advances. To support his claim, Plaintiff attempts to fashion a nexus between comments he supposes Goslings made to Trimm and his eventual probation. Plaintiff jumps to this conclusion based on Trimm's comment about people in the program being "fed up" with him. Plaintiff suspects this comment originated from Goslings because "all of his [other] evaluations were positive except for those submitted by Dr. Goslings." (Doc. 66 at 19). The excerpt of deposition testimony upon which Plaintiff relies relates specifically to a meeting that appears to have occurred before November 2016. (*See* Doc. 56-1 at 151 – 154). At that time, the only evaluation Plaintiff received from Goslings was the generally positive evaluation from 2014. Plaintiff offers no evidence Goslings made any derogatory comment to Trimm – he only offers his opinion, which cannot defeat summary judgment. *See Youngs v. Meridian Pointe, WRMC, Inc*., 2010 U.S. Dist. LEXIS 106915, at *14 (M.D. Fla. Oct. 5, 2010) (finding an employee's subjective assessment of his performance insufficient to defeat summary judgment); *Anders v. Dolgencorp, L.L.C.*, 2013 U.S. Dist. LEXIS 13306, * 12 (N.D. Ohio Jan. 10, 2013) ("Plaintiff presents no evidence that the comments were related to Plaintiff's age or to Ms.

Urbas' decision to terminate her employment.").  There is no material factual dispute in the record to support Plaintiff's deduction that Goslings was the source of negative comments to Trimm about Plaintiff; in fact, the record affirmatively establishes that other residents and personnel held poor opinions of him.  (Doc. 56-1 at 531– 533).

The record also undermines Plaintiff's second contention – that he was placed on probation due to Goslings' evaluation from November 2016, which Plaintiff deduces was motivated by his failure to respond to her advances.  Goslings submitted her evaluation of Plaintiff's performance on November 28, 2016, and Plaintiff was informed he was being placed on probation on January 9, 2017.  The record is replete with evidence that Trimm placed Plaintiff on probation for his undisputed "red zone" ITE scores and non-compliance with required remediation.[5]  With this, and the one and a half months lapse between Goslings' review and Trimm's imposition of probation, Plaintiff cannot demonstrate a reasonable 'verbal/temporal' relationship between Goslings' alleged conduct and his probation.  See *Early,* 54 F. Supp. 2d at 1267 (citing *Fowler v. Sunrise Carpet Indust., Inc.*, 911 F. Supp. 1560, 1578 (N.D. Ga. 1996)).

Plaintiff next argues a reasonable nexus between his refusal of Goslings' advances and the imposition of probation is evidenced by the seven-week lag between Trimm's receipt of Plaintiff's ITE scores and his placing Plaintiff on probation, with the only intervening event being the receipt of Goslings' evaluation.  However, Plaintiff ignores other parts of the record which bear directly on this point.  The record establishes that residents who failed to comply with remediation requirements after falling into the "red zone" twice would be placed on probation

---

[5] *See e.g.,* Doc. 56-1 at 454 – 470*;* Doc. 56-2 at 20 – 22, 25, 97 – 104; Doc. 56-9 at 13; Doc. 56-10 at 5.

and that residents who fell into the "red zone" without significant improvement from the prior year's score would be placed on probation.  (*See* Doc. 56-2 at 96.).  The record reflects that between November 15, 2015 and April 10, 2017, Plaintiff supplied unsatisfactory remediation work on at least four occasions.  (Doc. 56-1 at 465 – 470, 507).  The undisputed evidence also shows Plaintiff's ITE scores *dropped* from his second to third year of residency.  (Doc. 56-1 at 456, 463).  Finally, Plaintiff relates no specific "advance" or "rebuff" to this review.

Plaintiff also attempts to demonstrate a nexus between Goslings' November 28, 2016 evaluation and his probation by citing two "favorable" statements from other attending physicians.  The first statement was from his academic advisor, Dr. Daniel Preud'Homme, M.D.  Dr. Preud'Homme testified he felt Goslings' evaluations received too much weight.  (Doc. 64-15 at 3).  However, Dr. Preud'Homme made this comment concerning the weight that was afforded to Goslings' evaluations in Plaintiff's semi-annual reviews, not whether Plaintiff should have been placed on probation.  Dr. Preud'Homme noted this specifically, stating Trimm did not consider attending physicians' evaluations for determining whether a resident should be placed on probation.  (Doc. 56-10 at 3, 21 – 22).  Further, Dr. Preud'Homme testified that Trimm kept faculty evaluations and probationary considerations entirely separate, Plaintiff's probation was predominantly the result of his ITE scores, and Plaintiff's probation was not retaliatory.  (Doc. 56-10 at 3 – 5, 21).

The second statement Plaintiff relies upon is from Dr. Curtis Wade Turner, M.D.  Here, Plaintiff argues that Trimm (and by virtue of Trimm, Goslings) sought to punish Plaintiff by requesting Dr. Turner to lower the evaluation he conducted of Plaintiff because it was "too high." (Doc. 64-10 at 5 – 6).  While the evidence shows Trimm requested Turner revise Plaintiff's

evaluation, Turner refused.  (Doc. 64-10 at 9).  Plaintiff provides no argument here to connect Goslings' alleged actions to Trimm requesting Turner to lower the evaluation score.  With no evidence, the Court can find no nexus between anything Goslings did and Plaintiff's probation.

Plaintiff argues that a causal connection between Goslings' actions and the imposition of probation is evidenced by the fact that Trimm did not place a comparator on probation for "the exact same thing."  (Doc. 66 at 21).  Plaintiff's purported comparator did not do "the exact same thing[]" as Plaintiff suggests.  Plaintiff was not placed on probation solely for his "red zone" scores.  Trimm placed Plaintiff on probation due to his "red zone" scores **and** his unsatisfactory remediation work.  (Doc. 56-2 at 29, 98 – 99).  Plaintiff's comparator's participation in and the quality of her remediation work was materially greater than Plaintiff's.  The comparator turned in one late remediation assignment while Plaintiff's were routinely late.  Plaintiff actively resisted his Remediation plan and submitted substandard work requiring additional correction.  The comparator embraced her remediation plan and submitted satisfactory work.  Plaintiff can point to no evidence to create a material factual issue of unequal treatment between him and his supposed comparator.

No record evidence suggests anything Goslings did bears any relation to Plaintiff's probation.

### 2.      Plaintiff's hostile environment sexual harassment claim against Goslings

Goslings also contends she is entitled to judgment as a matter of law because her behavior, taken as alleged by Plaintiff, was not sufficiently severe or pervasive to create a hostile work environment as a matter of law.  (Doc. 57 at 24).  Specifically, Goslings argues she is due summary judgment because she and Plaintiff's interactions were too sporadic to be considered

pervasive, the evidence belies Plaintiff's alleged feelings of discomfort, and her conduct was not sexual or harassing.  (*Id.* at 25).

In opposition, Plaintiff asserts he satisfied his burden of establishing a hostile work environment because "he subjectively perceived the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and his perception was objectively reasonable . . ."  (Doc. 66 at 22).  Plaintiff contends he subjectively felt the pressure of Goslings' advances while in the workplace, especially given Goslings' power in the program, and those concerns were objectively reasonable given the demanding nature of residency.  (*Id.* at 22 – 23).

To establish a hostile environment sexual harassment claim, Plaintiff must prove:

> (1) the he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently sever or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable

*Mendoza v. Borden, Inc.,* 195 F. 3d 1238, 1245 (11th Cir. 1999).  Goslings contends Plaintiff cannot satisfy the second and fourth prongs of this test.

Plaintiff's allegations surrounding Goslings conduct fall into four categories: (1) invitations to activities outside the hospital; (2) various instances of physical touching; (3) treating Plaintiff with condescension on the hospital floor; and (4) looking at him in a way that made him feel as though she was not listening to him.  (Doc. 56-1 at 54 – 55, 59, 63 – 64; Doc. 64-1 at 50 – 51).  Goslings argues no instances were sufficiently harassing nor of a sexual nature to satisfy the second prong of the *Mendoza* test.  She is correct.

To begin, Goslings' invitation to her home (Doc. 56-1 at 52 – 53, 62 – 64, 67) was not a sexual advance. Plaintiff contends this invitation was sexual in nature because she sat too close to him and there was no reason for a faculty member to invite a resident to hang out with them after hours.  However, Plaintiff offers nothing to substantiate his belief beyond the belief itself. (*See* Doc. 56-1 at 52 – 53).  The record demonstrates that Goslings extended Plaintiff an open invitation to her home if he needed anything given they were neighbors.  (Doc. 56-4 at 14). Similarly, Goslings invited a group of residents she was supervising to a public glass fusion course after Plaintiff chided her about the "free time" she had as an attending physician.  (Doc. 56-4 at 16 – 17).  The record includes text messages from Plaintiff to Goslings inviting her to his house for a party and to a social gathering at a bar with others from South.  (Doc. 56-1 at 873 – 888). The Court, drawing all justifiable inferences in Plaintiff's favor, finds that Goslings' invitations of which Plaintiff complains were not of a sexual nature.

Plaintiff also has failed to demonstrate a material factual dispute to support his claim that Goslings' condescending treatment and distracted looks constitute a hostile work environment. The undisputed evidence demonstrates that these actions were not of a sexual nature.  Neither were they were in reprisal for Plaintiff's refusal of Goslings' advances.  The record establishes that Goslings was confronted with complaints from other residents who believed her methods were too confrontational.  (Doc. 56-1 at 532 – 33; Doc. 56-4 at 4).  The record also shows she was attempting to address that behavior.  (Doc. 56-2 at 75).  The factual record relating to Plaintiff's allegations of condescending treatment and distracted looks, taken in the light most favorable to Plaintiff, simply does not support a hostile work environment claim.

Plaintiff's allegations that Goslings engaged in unwanted sexual advances by initiating physical contact make for a closer question.  Goslings admitted to episodic physical contact. Plaintiff indicated his discomfort by moving away.  Considering these facts, the Court must determine whether Goslings' "touching" and "sitting too close" were sufficiently severe or pervasive as to constitute sexual harassment.

Plaintiff must show Goslings' "touching" was sufficiently severe and pervasive enough to defeat summary judgment.  To show sufficient severity and pervasiveness,

> [the defendant's behavior] must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  In determining whether the complained-of sexual harassment was sufficiently hostile or abusive to affect a term, condition or privilege of employment, courts are to look at all the circumstances, including the frequency and severity of the conduct. Courts should also look at whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The Supreme Court has made it clear that Title VII is not a general civility code. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to a hostile work environment.

*Orquiola v. Nat'l City Mortg. Co*., 510 F. Supp. 2d 1134, 1149 (N.D. Ga. 2006) (internal citations and quotations omitted).

The Eleventh Circuit has recently noted "[t]o qualify as severe or pervasive, the work environment 'must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.'"  *Allen v. Ambu-Stat, LLC*, 2020 U.S. App. LEXIS 1450, *9 (11th Cir. Jan. 16, 2020) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  For purposes of summary judgment, even if the Court accepts that Plaintiff subjectively felt discomfort when Goslings touched him in some

circumstances, he cannot objectively demonstrate that the conduct was severe or pervasive so as to constitute a hostile environment.

In *Ambu-Stat*, the Eleventh Circuit reiterated the way district courts should compare sexual harassment allegations to prior determinations to assess whether conduct in a particular case is severe or pervasive.  *Ambu-Stat, LLC*, 2020 U.S. App. LEXIS 1450, at *10-11.  The court looked at the facts of two longstanding benchmark decisions and its analysis is instructive for comparison in the present case:

> In *Mendoza*, the plaintiff alleged four categories of harassing conduct: (1) one instance in which the alleged harasser said to Mendoza "I'm getting fired up"; (2) one occasion in which the alleged harasser rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which the alleged harasser made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) the alleged harasser's "constant" following and staring at Mendoza in a "very obvious fashion." 195 F.3d at 1247. This conduct occurred over 11 months. *Id*. at 1249. Nonetheless, we found these acts were not sufficiently pervasive to survive summary judgment. *See id*. at 1247.

> Then in *Gupta v. Florida Board of Regents*, we addressed a fact pattern that involved multiple attempts to make physical contact with the plaintiff, including touching the inside of her thigh, a ring on her finger, and a bracelet on her arm, as well as lifting the hem of her dress on one occasion. 212 F.3d 571, 579 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). The putative harasser also repeatedly engaged the plaintiff outside of work, calling her house, at night, two to three times per week on average, sometimes asking if she was in bed and inquiring where her boyfriend was. *Id*. at 578. He also frequently asked her to lunch, and when she started having lunch with other co-workers, the harasser lashed out, calling the co-workers "racist" and "evil." *Id*. These incidents occurred over a period of six or seven months. *Id*. at 579. There too a panel of this Court found that the plaintiff failed to sufficiently establish the required level of pervasiveness.

*Ambu-Stat* at 10-12.   In *Ambu-Stat,* the Eleventh Circuit found the appellant's allegations of sexual harassment insufficiently severe or pervasive where the alleged conduct constituted five comments over a four-month period.  *Ambu-Stat* at 12 – 13.  The court noted that the comments, which were sporadic and "spread over four months, can hardly be described as frequent."  *Id.* at 12.  The comments were "one-off," "spread across several months," and "made by an individual [appellant] calls a friend."  *Id.* at 13.

When compared with *Mendoza* and *Gupta*, as well as with *Ambu-Stat*, the Court finds that the conduct at issue in this case is not sufficiently pervasive.  To begin, the Court notes the frequency of the conduct.   While Plaintiff testified that the touching was "constant," the undisputed evidence shows over the three years of his residency, Plaintiff only served on in-patient rotations in August 2014, December 2014, January 2015, April 2015, November 2015, January 2016, November 2016, January 2017, and June 2017.  (Doc. 56-13 at 2 – 4).  During these rotations, Plaintiff and Goslings would only work together directly if they were actually on the same shift and he was assigned to her team.  (*See* Doc. 56-2 at 67; Doc. 56-3 at 3; Doc. 56-5 at 5 – 6).  Over the three years of his residency, Plaintiff worked intermittently with Goslings across nine (9) non-consecutive months.  Only Goslings' evaluations indicate how many actual days in each of those months Plaintiff worked with Goslings.  Further, considering the faculty evaluation policy (Doc. 56-2 at 66), the undisputed evidence indicates Plaintiff did not work with Goslings for five consecutive days during those months (other than the 2014 and 2016 evaluations in the record).  Thus, this "touching" would have occurred infrequently.

As to the severity of the conduct, the Court notes that each instance of physical contact Plaintiff describes were momentary. (Doc. 56-1 at 60).  In each instance, Plaintiff indicated he

scooted away from Goslings when he felt uncomfortable, and the evidence demonstrates Goslings did not attempt to re-initiate or insist on further contact.  Plaintiff argues this interfered with his performance during rotations due to his constant concern, though this is not borne out in the record considering the infrequency with which Gosling and Plaintiff worked together.  The Court finds Goslings is due summary judgment on this claim.

> ### B.    Plaintiff's § 1983 claim against Trimm[6]

Trimm argues he is entitled to summary judgment because Plaintiff cannot establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework.  Trimm argues Plaintiff cannot show his purported comparator is sufficiently similar to qualify as such, cannot show Trimm discriminated against Plaintiff based on gender when he placed Plaintiff on probation, and cannot show Trimm treated Plaintiff's proposed comparator more favorably than him.  Trimm also argues Plaintiff cannot rebut his legitimate, non-discriminatory reasons for placing Plaintiff on probation.  In opposition, Plaintiff contends his comparator is sufficiently similar to establish a *prima facie* case under the *McDonnell Douglas* framework, Trimm afforded his comparator materially favorable treatment, and Trimm's reasons for Plaintiff's probation are pretextual.

Plaintiff must show the following to establish a *prima facie* case of discrimination: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) other employees outside of his protected classification were treated more favorably.  *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1092 (11th Cir.

---

[6] Because the Court finds Trimm is entitled to summary judgment on the merits of Plaintiffs claim it does not reach the question of whether he is entitled to qualified immunity.

2004);  *see also Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1302 (N.D. Ga. 2010); *aff'd,* 663 F.3d 1312

(11th Cir. 2011) (indicating the elements of plaintiff's claim are the same as if he had sued under

Title VII).  Plaintiff's proposed comparator must be "similarly situated [to him] in all material

respects." *Lewis v. City of Union City,* 918 F.3d 1213, 1227 (11th Cir. 2019).

In *Lewis*, the Eleventh Circuit clarified that a proposed comparator would be "similarly

situated in all material respects" where the comparator and plaintiff:  (1) engaged in the same

basic conduct or misconduct; (2) were subject to the same employment policy, guideline, or rule;

(3) were ordinarily under the jurisdiction of the same supervisor; and (4) shared the same

employment or disciplinary history.  *See Lewis*, 918 F.3d at 1227-28.   In sum, the *Lewis* court's

instruction is to focus on the "substantive likeness" between a plaintiff and his proposed

comparator.  *Id.*  If the court finds that the two "cannot be reasonably distinguished," the

comparator is valid.  *Id.*[7]

Trimm does not dispute that Plaintiff meets the first three criteria of the *McDonnell*

*Douglas* test.  Trimm argues Plaintiff cannot show his proposed comparator is similarly situated

in all material respects because the comparator exerted greater effort and achieved superior

results in her remediation work as compared to Plaintiff.  Plaintiff argues that these differences

are "minor" and his proposed comparator satisfies the *Lewis* criteria because she and Plaintiff

scored in the ITE "red zone" each year of their residency and she submitted a tardy assignment

during her remediation.  Plaintiff's argument is unpersuasive.

---

[7] The test in *Lewis* allows employers "the necessary breathing space to make appropriate business judgments." *Lewis,* 918 F.3d at 1228.  This standard grants employers the ability to "accord different treatment to employees who are differently situated in 'material respect' – e.g., who engaged in different conduct . . . or who have different work histories."  *Id.*  As discussed herein, Plaintiff and his proposed comparator engaged in different conduct with regard to remediation and had materially dissimilar disciplinary history.

To begin, the Court notes that Plaintiff and his proposed comparator engaged in the same basic conduct; each scored in the "red zone" based on their respective ITE scores in each year of residency.  Similarly, they were subject to the same employment policy (South's Handbook) and were under Trimm's direct supervision as South's program director.  However, their respective remediation conduct and disciplinary records are materially dissimilar.

The record is undisputed that Plaintiff was generally hostile to his remediation work. Plaintiff submitted work which was untimely, sub-standard, or non-responsive.  (Doc. 56-1 at 465 – 470; Doc. 56-2 at 31).  Plaintiff's comparator was cooperative throughout the remediation process, going so far as to reach out to Trimm to discuss how she might address her ITE shortcomings in her third year of residency.  (Doc. 56-2 at 60, 65).  This differs markedly from Plaintiff's approach, which appeared to consist of resisting the remediation plan because it was not the way he studied.  (Doc. 56-1 at 149).

As to disciplinary records, the Court notes on several occasions, Plaintiff submitted tardy assignments and each late assignment required further revision.  (Doc. 56-2 at 97).  Plaintiff's proposed comparator, on the other hand, submitted only one tardy assignment during her remediation.  (Doc. 56-2 at 60).  In light of these undisputed facts and the Eleventh Circuit's clarified comparator standard in *Lewis*, the Court finds Plaintiff has not offered a similarly situated comparator for the purpose of establishing a *prima facie* case of discrimination.

C.      **Plaintiff's claim against South for violation of Title IX**

In his final claim, Plaintiff contends South was deliberately indifferent towards him because Trimm ignored Plaintiff's complaints of Goslings' behavior.  Specifically, South argues Plaintiff cannot establish a *prima facie* case against it for this claim because Plaintiff's notice to

Trimm, at best, was notice of inappropriate behavior that did not constitute harassment.  Further, South initiated an investigation immediately upon receipt of Plaintiff's subsequent anonymous complaint.

The Eleventh Circuit has stated a plaintiff must show the following to survive summary judgment on a Title IX deliberate indifference claim:

> (1) an official with the authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct. Actual notice of sexual harassment is required; liability may not be based on constructive notice or *respondeat superior* theories. For Title IX liability to arise, a school official who possess, at a minimum, the authority to institute corrective measure on behalf of the school must have actual knowledge.

> Deliberate indifference occurs when the official's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. The deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it.  In essence, a school must officially decide not to remedy the violation for its response to rise to the level of deliberate indifference

*Kocsis v. Fla. State Univ. Bd. of Trs.*, 2019 U.S. App. LEXIS 29850, *5-6 (11th Cir. Oct. 4, 2019) (internal citations and quotations omitted).  Neither party disputes Trimm had the authority to take corrective measures if Plaintiff gave him actual notice that Goslings sexually harassed him. The key question here is whether Trimm was put on *actual notice* by anything Plaintiff told him. Plaintiff contends he informed Trimm that Goslings sexually harassed him on at least one occasion during a semi-annual review.  (Doc. 66 at 33 – 34).  Plaintiff argues that when he complained about the number of evaluations he received, or questioned the negative ones he received, this constituted notice to Trimm that Goslings was harassing him and discriminating

against him because he would not accept her sexual advances.  Plaintiff contends he put Trimm

on actual notice of Goslings' inappropriate behavior during these meetings.  (*Id.*).

The Court finds South's citation to *Kocsis* persuasive.  There, the Eleventh Circuit affirmed

summary judgment for the defendant-university where the plaintiff failed to provide actual

notice to an official with authority to take corrective measures.  *Kocsis*, 2019 U.S. App. LEXIS

29850, at *8.  That court found a professor's notice to such an official insufficient because "[his

email] did not contain enough detail to notify the University of the nature of Dr. Gertz's

comments or the possible need to act."  *Id.* at *8 – 9.  The email in *Kocsis* was from a university

program director to the Dean of Students.  In the email, the director notified the Dean that the

plaintiff came to him with a complaint regarding comments a professor made during lectures.

The program director stopped the plaintiff during their conversation and informed her that the

Dean was the proper person to discuss that problem with.  The program director was never

apprised of what the professor allegedly said.  *Id.* at 4 n. 1 (11th Cir. 2019).

Similar circumstances exist here.  Although Plaintiff contends his complaints regarding his

evaluations put Trimm on notice that Goslings sexually harassed him, the record does not support

this position.  As Plaintiff points out, context is key.  The deposition testimony Plaintiff relies upon

is part of an examination about why Plaintiff brought Goslings up in his semi-annual meetings

despite her never reviewing Plaintiff during his second year of residency.  The key question seems

to be:

> Q:  Did you ever tell Dr. Trimm that you believed Dr. Goslings had
> given you a negative evaluation or was withholding evaluations
> because you refused sexual advances by her?
>
> A:  No.

(Doc 56-1 at 160).  Plaintiff contends he told Trimm Goslings was acting inappropriately on the floor, including sitting "too close to him" and "acting unprofessional and condescending to him." (Doc. 56-1 at 72, 152, 154).  To the extent Plaintiff informed Trimm that Goslings "sat too close" to him, such a remark is insufficiently detailed to put Trimm on actual notice of any harassment by Goslings.  *See Kocsis,* 2019 U.S. App. LEXIS 29850 at *8 – 9.

The record does not show Plaintiff gave Trimm sufficient detail to be on actual notice of any harassment.  Viewing this testimony in context, and in a light most favorable to Plaintiff, these conversations did not center on Goslings' conduct as Plaintiff suggests.  Rather they show Plaintiff put Trimm on notice he was dissatisfied with the number of written evaluations he received because he felt they disproportionately lowered his rankings among other students. (Doc. 56-1 at 152).  Complaining about the number of written evaluations he received (or did not receive) is markedly different from informing Trimm he was being sexually harassed while under Goslings' supervision.

The Court further finds that Plaintiff has failed to demonstrate any genuine issue of fact regarding deliberate indifference.  The record established that on the same day South received Plaintiff's anonymous complaint,  Dr. Samuel McQuiston, M.D. contacted relevant personnel at South to investigate.  After an investigation, which included reviews of the pediatrics residents' performance ratings, Dr. Goslings' reviews of residents, anonymous reviews of Goslings submitted by residents, and a discussion with the previous DIO, Dr. McQuiston determined there "[was] not enough specifics in the anonymous complaint and nothing in the data or comments that would suggest a further review or additional discussion or interviews were necessary at that time."  (Doc. 56-8 at 3).

Four months later, Plaintiff's counsel sent South a notice-of-suit letter. South began a detailed months-long investigation based on the allegations in that letter. Plaintiff chose not to participate in that investigation. The investigation, which concluded no sexual harassment took place, consisted of interviews of faculty and residents throughout South's pediatrics program. At the conclusion of the investigation, South's Compliance Officer found that "the alleged conduct did not occur or d[id] not constitute a Sexual Misconduct policy violation." (Doc. 56-1 at 537). South is entitled to summary judgment on Plaintiff's claim.

###### D.    Plaintiff's request for injunctive relief

Plaintiff's request for "any form of injunctive relief the Court finds appropriate" fails for two reasons. (Doc. 66 at 35). First, Plaintiff may not have equitable injunctive relief because his underlying legal claims fail. *See Levine v. EverBank Fin. Corp.*, 2017 U.S. Dist. LEXIS 109323 at *30 -31 (N.D. Ga. Feb. 10, 2017); *DM Arbor Court, Ltd v. City of Hous.,* 2019 U.S. Dist. LEXIS 158853 at *19 (S.D. Tex. Sep. 19, 2019); *Jacobsen v. Bank of Am. Corp., (In re Jacobsen),* 2012 Bankr. LEXIS 4224 at *14 (Bankr. E.D. Tex. Sep. 12, 2012) ("Since the debtor's underlying claims fail, the debtor's request for injunctive relief, which is premised on the failed claims, is without basis.") (relying on *DSC Comm. Corp. v. DGI Techs, Inc.*, 81 F.3d 597, 600 (5th Cir. 1996)). Second, Plaintiff's request for injunctive relief fails because Plaintiff fails to identify the relief he wants. The nebulous request for "any form of injunctive relief the Court finds appropriate" is manifestly inadequate. *See, e.g., Wright v. Barnes*, 2015 U.S. Dist. LEXIS 172971 at *5 – 6 (M.D. Fla. December 15, 2015) (finding that plaintiff "failed to state a claim for injunctive relief because he has failed to identify the injunctive relief he is seeking"); *Bailey v. Williams* , 2017 U.S. Dist. LEXIS 6159,*3 (M.D. Ala. Jan. 13, 2017) (citing *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th

Cir. 1999))("Rule 65(d) of the Federal Rules of Civil Requests for injunctions must be specific; an injunction which merely orders a defendant to obey the law is too broad and too vague to be enforceable."); *Johnson v. Severson*, 2018 U.S. Dist. LEXIS 132736, at *17-18 (S.D. Fla. Jan. 26, 2018) (dismissing Plaintiff's complaint: "[h]ere, not only does Plaintiff fail to request any permissible injunctive relief, Plaintiff has again failed to allege any facts whatsoever that would state a claim[.]").

## CONCLUSION

For the reasons stated, Defendants' Motion is granted.

**DONE and ORDERED** this 21st day of February, 2020.

/s/ JEFFREY U. BEAVERSTOCK
UNITED STATES DISTRICT JUDGE